# 16-1326-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



RUBEN DIAZ, RENE FERNANDEZ, MOHAMMED ISMAT, PRADIP SAHA, RAMANDRA SAHA, MAXINE SMITH, ABDUR RAQUIB, JOHNNY RAMIREZ, MADGY SAAD, WALTER FREIRE, MOZIBUR RAHMAN, CHRISTOHER STAVROPOULOS, ABDUR RAHMAN, SYED AHMED, WALTER GARCIA, ASHIF MIRU, BISWA SAHA, SAYOT ALPHONSE, ALBERTO PRADO, MAURICE SCHWARTE, ABELLA BOUALE, DENZIL HANNAH, MILAD BARSOUM, MOAZZEMUL HAQUE, ARUN SAHA,

*Plaintiffs-Appellees,*

*v.*

AMEDEO HOTELS LIMITED PARTNERSHIP,

*Defendant-Appellant,*

*and*

NWPH, LLC, N.W. HOSPITAL,

*Defendants.*

———————————

*On Appeal from the United States District Court
for the Eastern District of New York (Brooklyn)*

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

Paul E. Wagner
John R. Hunt
STOKES WAGNER, ALC
*Attorneys for Defendant-Appellant*
903 Hanshaw Road
Ithaca, New York 14850
607-257-5165

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1, Defendant-Appellant hereby states that Amedeo Hotels Limited Partnership is a privately owned company and is not a publicly held corporation, that owns 10% or more of its stock.

# **Table of Contents**

JURISDICTIONAL STATEMENT ............................................................1

ISSUE PRESENTED FOR REVIEW .......................................................1

STATEMENT OF THE CASE ................................................................2

SUMMARY OF ARGUMENT.............................................................14

ARGUMENT .......................................................................................16

   A.   The IWA Was Scrupulously Followed, and the Servers Availed Themselves

of the Grievance Process Provided in the IWA. ..................................16

   B.   The Servers' Claims Are Preempted by the LMRA, Because They Require

Determination of Whether the Captains Are Managers, and Will Affect the

Interpretation of the Overtime Provision of the IWA. .........................19

CONCLUSION ...................................................................................27

CERTIFICATE OF COMPLIANCE ....................................................29

<u>**Table of Authorities**</u>

**Cases**

*Bermuda Container Line Ltd. v. Int'l Longshoremen's Ass'n, AFL-CIO*,
   1997 WL 795766, at *9 (S.D.N.Y. Dec. 29, 1997) ............................................29

*Brandon v. City of New York*,
   705 F. Supp. 2d 261, 278 (S.D.N.Y. 2010).........................................................30

*Carlsbad Technology, Inc. v. HIF Bio, Inc*.,
   129 S.Ct. 1862 (2009) .........................................................................................5

*CGLM, Inc. & Alan Kansas, an Individual*,
   2007 WL 633122 (NLRB Div. of Judges Feb. 27, 2007)...................................28

*Gen. Teamsters Local Union No. 174 v. N.L.R.B.*,
   723 F.2d 966, 971 (D.C. Cir. 1983) ...................................................................25

*Hoops v. Keyspan Energy*,
   822 F.Supp.2d 301 (E.D.N.Y. 2011) ...........................................................23, 24

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v.
   Mack Trucks, Inc.*, 820 F.2d 91, 96 (3d Cir. 1987)...........................................26

*Johnson v. D.M. Rothman Co., Inc.*,
   861 F.Supp.2d 326, 331-332 (S.D.N.Y. 2012) .......................................19, 23, 24

*Lingle v. Norge Div. of Magic Chef, Inc*.,
   486 U.S. 399, 413 (1988)...............................................................................19, 23

*Matter of Associated Gen. Contractors, New York State Chapter, Inc*.,
   36 N.Y.2d 957, 959, 335 N.E.2d 859, 859 (1975)..............................................22

*N.L.R.B. v. Kentucky River Cmty. Care, Inc.*,
   532 U.S. 706, 711 (2001)...................................................................................28

*Nat'l Basketball Ass'n v. Williams*,
   45 F.3d 684, 689-690 (2d Cir. 1995) .................................................................25

*Nat'l Labor Relations Bd. v. Truck Drivers Local Union No 449, Int'l Bhd. of Teamsters, Chauffeurs Warehousemen, & Helpers of Am. A.F.L.*,
  353 U.S. 87, 95-96 (1957) ("*Buffalo Linen*") ......................................25

*Nolde Bros. v. Local No. 358, Bakery & Confectionery Workers Union, AFL-CIO*,
  430 U.S. 243, 254 (1977)...........................................................22

*Pitta v. Hotel Ass'n of New York City, Inc.*,
  806 F.2d 419, 422 (2d Cir. 1986)...............................................21

*Ramsey v. N. L. R. B.*,
  327 F.2d 784, 786-787 (7th Cir. 1964) .....................................21

*Thermtron Products, Inc. v. Hermansdorfer*,
  423 U.S. 336 (1976)..................................................................5

*Thomas v. Egan*,
  1 F. App'x 52, 54 (2d Cir. 2001) ...............................................30

*Torres v. Four Seasons Hotel of New York*,
  277 A.D. 23, 715 N.Y.S. 2d 28 (2000) ....................................21

*United Steelworkers of America v. Warrior & Gulf Navigation Co.*,
  363 U.S. 574, 578-580 (1960) ..................................................26

*Vera v. Saks & Co.*,
  335 F.3d 109, 113-114 (2d Cir. 2003) ......................................23

*Weiss v. Mayflower Doughnut Corp.*,
  1 N.Y.2d 310, 316, 135 N.E.2d 208, 210 (1956)...............19, 22

**Statutes**

28 U.S.C. § 1331 .............................................................................6

28 U.S.C. § 1367 .............................................................................6

28 U.S.C. § 1447(d)........................................................................5

28 U.S.C. § 1441(c).........................................................................6

29 U.S.C. § 152(11)....................................................................................27

29 U.S.C. § 152(3)......................................................................................27

29 U.S.C. § 157 ..........................................................................................27

29 U.S.C. § 173(d).....................................................................................22

29 U.S.C. § 185 ............................................................................................6

Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ..................................5

National Labor Relations Act......................................................................27

New York Labor Law......................................................................16, 17, 31

Section 301 of the LMRA ..........................................5, 6, 18, 19, 23, 31

## Other Authorities

Harry Shulman, *Reason, Contract, and Law in Labor Relations,*
  68 Harv. L. Rev. 999, 1001-1002 (1955)..............................................26

## JURISDICTIONAL STATEMENT

This is an appeal from that portion of the District Court's summary judgment Order which ruled that plaintiffs' state claims were not preempted under federal law and remanded those claims back to the state court. The Order also granted summary judgment to the defendants on plaintiffs' federal claims. The Order was dated March 29, 2016, with judgment entered on March 30, 2016. Appellant Amedeo Hotels timely filed an appeal on April 27, 2016, which was stayed pending a decision on Plaintiffs/Appellees' motion for reconsideration, and was temporarily withdrawn by the parties, but was reinstated by this Court on September 25, 2017. The appeal is not precluded by 28 U.S.C. § 1447(d), and the district court's order is reviewable pursuant to *Thermtron Products, Inc. v. Hermansdorfer*, 423 U.S. 336 (1976), and *Carlsbad Technology, Inc. v. HIF Bio, Inc*., 129 S.Ct. 1862 (2009).

## ISSUE PRESENTED FOR REVIEW

Whether the Plaintiffs/Appellees' wage claims under the New York Labor Law are preempted by Section 301 of the Labor-Management Relations Act where the Plaintiffs/Appellees have been paid in accordance with a collective bargaining agreement, where the concerns reflected in their state law claims were expressly addressed with the union of which they are members, and where the determination of their claims depends on the collective bargaining agreement and a supplementary Agreement to which these Plaintiffs/Appellees specifically agreed.

1

## STATEMENT OF THE CASE

Procedural History.  The Plaintiffs/Appellees (hereinafter "the Servers"), are or were servers or assistant servers in the In-Room Dining Department of the New York Palace Hotel.  The Servers' original Complaint in this case was filed on September 8, 2011, in the Supreme Court of the State of New York, Kings County, seeking allegedly unpaid wages pursuant to New York law.  Plaintiffs filed a Third Amended Complaint filed on August 13, 2012 that raised for the first time claims under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA").  The case was removed by Defendant/Appellant Amedeo Hotels Limited Partnership ("Amedeo") and co-defendant NWPH, LLC ("NWPH"), to the United States District Court for the Eastern District of New York on August 24, 2012, asserting the District Court's jurisdiction pursuant to 28 U.S.C. § 1331 and the FLSA, as well as supplemental jurisdiction over the state law claims under 28 U.S.C. §§ 1441(c) and 1367. D.Ct. Doc. 3.

Amedeo and NWPH filed Motions for Summary Judgment on April 14, 2015. D.Ct. Docs. 68-79.  The Servers opposed the Motions, D.Ct. Docs. 80-83, Defendants responded, D.Ct. Doc. 84, and the district court issued a decision on March 29, 2016, D.Ct. Doc. 86.  In her decision partially granting summary judgment to defendants, District Judge Joan M. Azrack agreed with Defendants that plaintiffs' FLSA claims were without merit, but rejected Defendants' assertion that

the state law claims are preempted by Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185. *See* D.Ct. Doc.86 (JA- 342-363). She then remanded the state law claims to the New York Supreme Court. *Id.* Judgment on the opinion was entered the next day, March 30, 2016, which relinquished jurisdiction over the remaining claims and closed the case. *See* D.Ct. Doc. 87 (JA-535).

The Servers moved for further reconsideration of the court's decision on April 12, 2016. D.Ct. Doc. 88. Both Defendants opposed the motion, D. Ct. Docs. 90, 92-94, and the district court denied the motion on June 14, 2017. D.Ct. Doc. 97.

The Servers declined to appeal the dismissal of their FLSA claims to this Court, but Amedeo timely filed a notice of appeal on April 27, 2016. *See* D.Ct. Doc. 91 (JA-365-368). The Servers sought and were granted a stay of the appeal while the district court reviewed their Motion for Reconsideration. D.Ct. Doc. 96; App. Ct. Docs. 31, 32. The stay was lifted on June 23, 2017, following the district court's denial of the motion. D.Ct. Doc. 98, App. Ct. Docs. 52, 54.

The parties stipulated on September 7, 2017, to withdraw the appeal while they participated in the Court's CAMP mediation program, without prejudice to possible reinstatement by Amedeo. App. Ct. Doc. 67. This Court so ordered on September 11. App. Ct. Docs. 75, 76. By letter dated September 25, 2017, Amedeo requested reinstatement of the appeal, which this Court granted on the same date. App. Ct. Docs. 79, 80.

Factual Background. Defendant/Appellant Amedeo Hotels Limited Partnership ("Amedeo"), operated the New York Palace Hotel until July 11, 2011.[1] *See* Deposition of Jess Wilner at p.17 (JA-89). During this time, the hotel had a room service or In Room Dining ("IRD") department. *See* Declaration of Brandon McCurley at ¶4 (JA-319). The IRD department occupied the fourth floor of the hotel. Meals were prepared on this floor for delivery to the guest rooms. *Id.* at ¶ 3 (JA-319). The IRD Department provided both "a la carte" and hospitality services to guests. A la carte service involved the delivery of individual food and beverage orders to guest rooms. Hospitality service included providing food and beverage service for social functions held by guests in guest rooms. Hospitality service also included functions known as "One-on-Ones", which were events in which corporate clients would rent a number of guest rooms from which much of the furniture would be removed. Food and beverages then would be provided in the rooms in a buffet. *Id.* at ¶6 (JA-319). The IRD department employed individuals in several job classifications. These included servers, assistant servers, captains and managers. *Id.* at ¶7 (JA-319). Servers primarily were responsible for delivering food and beverages to guest rooms in response to orders placed by guests. Their duties also included setting up and arranging for meals to be delivered to the guest rooms. *Id.* at

---

[1] Management of the Hotel was taken over by Amedeo's co-defendant NWPH, LLC, which is not participating in this appeal.

¶8 (JA-319).

The plaintiffs in this case were IRD servers who worked the a.m. and p.m. shifts. The a.m. shift was from approximately 6:00 a.m. to 2:00 p.m. and the p.m. shift was from approximately 2:00 p.m. to 10:00 p.m. The hotel also had an overnight shift, but none of the plaintiffs worked that shift. *Id.* at ¶9 (JA-320).

IRD captains generally functioned as head waiters who were responsible for coordinating the delivery of orders and assisting the servers in servicing the guests. *Id.* at ¶10 (JA-320); *see also* Affidavit of Gus Cecchini, at ¶¶9-11 (JA-336), Affidavit of Mustafa Bouriat at ¶¶ 5-11 (JA-511-512). Captains were not members of management and had no authority to hire, fire, discipline or schedule employees. *Id.* at ¶¶ 10,11 (JA-512); McCurley Dec. at ¶11 (JA-320).

The Servers and captains are represented by Local 6 of UNITE-HERE!, an affiliate of the New York Hotel Trades Council, AFL-CIO. Local 6 and the NYHTC are not a small, weak Union, but are among the most powerful and aggressive labor organizations in the United States. *See* http://hotelworkers.org/about/history/ fighting-for-social-justice-since-1939 (describing the Union's history of "fighting" for workers since the 1930s, including consistently increasing the workers' standards of living: "Today, our union's Industry-Wide Agreement (or 'IWA') is the best contract for hotel workers in the world. Our union has a great tradition of militant contract enforcement, activism for social justice, and member participation.

Through their union, our members have the ability to speak with one strong voice."). This IWA governs labor relations at 60% of the hotels in New York City.  *Id.*

Both the Union and the hotel were parties to the IWA. *See* McCurley Dec. at ¶12 (JA-320); *see also* Depositions of Biswa Saha, at p. 50 (JA-76).  The Servers' employment was governed by the IWA as well as supplemental agreements negotiated between the hotel and the Union that pertained to specific issues in the IRD department. *See* McCurley Dec. at ¶13 (JA-320).  The hotel was required to negotiate with the Union over the Servers' wages, hours and other terms and conditions of employment.  All of the IRD servers and captains were represented by the Union, and the hotel could not change their compensation or terms of employment without bargaining with the union.  (*Id.*)  A supplemental agreement pertaining to the hotel's IRD department was entered into between the hotel and the Union in 1994.  *See* Deposition of Pradip Saha, at p. 48 (JA-82). Another supplemental agreement pertaining to the hotel's IRD department was entered into between the hotel and the Union in 2011.  *See* JA-290-292; *see also* Deposition of Pradip Saha, at p. 50 (JA-84).

In 2010, the hotel's management learned that the Union wanted to bargain about a dispute that concerned IRD servers.  Management was provided with a copy of a letter which was addressed to the Union by its members.  *See* McCurley Dec. at ¶ 14 (JA-320) and Exhibit 1, thereto (JA-326).  The letter listed a number of

grievances by the servers including the distribution and amount of the service charges the hotel charged for hospitality events. *See* McCurley Dec. at ¶14 (JA-320) and Exhibit 1, thereto (JA-326).

The hotel and the Union proceeded to bargain over specific terms and conditions of the IRD servers' employment that were raised by the Union. These subjects included whether the hotel should eliminate the captain position and whether the portion of the service charge that IRD servers received for a la carte deliveries and hospitality functions should be increased. *See* McCurley Dec. at ¶15 (JA-321). These collective bargaining negotiations took place over a number of months. At least six or seven separate bargaining sessions were held. At all of these sessions, the servers and captains were represented by the Union. Mr. Edward Cedeno, who was the Union business agent responsible for the employees of the New York Palace, bargained on behalf of the servers and captains. *Id*. at ¶16 (JA-321). In addition to Mr. Cedeno, many IRD servers, ***all of whom are plaintiffs in this case***, attended the negotiation sessions. These included Union Delegates such as Mr. Magdy Saad and Mr. Biswa Saha. IRD captains also attended the negotiations. They included Mr. Mustapha Bouriat and Mr. John Dulcey, who was then a captain. These individuals also were represented by the Union. *Id*. at ¶17 (JA-321).

The parties exchanged proposals and eventually reached an agreement to

7

resolve the dispute. *Id*. at ¶18 (JA-321). This agreement was intended to supplement the IWA. *Id*. at ¶18 (JA-321). The Union held a meeting at which the employees voted to ratify the agreement. *See* Declaration of Alyssa Tramposch at ¶ 7 (JA-283); *see also* exhibits attached to Tramposch's Dec. (JA-284-317). The following plaintiffs voted to ratify the agreement at the Union meeting and cast written ballots in favor of doing so: Mr. Pradip Saha, Ms. Maxine Smith, Mr. Md. Mozibur Rahman, Mr. Mohammed Ismat, Mr. Magdy Saad, Mr. Abdur Rahman, Mr. Abdur Raquib, Mr. Ramendra Saha, Mr. Rene Fernandez, Mr. Mustapha Bouriat, Mr. Walter Freire, Mr. Ruben Diaz, Mr. Chris Stavropoulos, Mr. Milad Barsoum, Mr. Moazzemul Haque, Mr. Bisna Saha, Mr. Arun Saha, Mr. Maurice Schwarte, Mr. Denzil Hannah, Mr. Sayot Alphonse, Mr. Abella Bouale, and Mr. Ashif Miru. *See* defendant Amedeo's First Requests for Admission at ¶¶ 7-28 (JA-92-95). True and correct copies of the ballots cast by the plaintiffs can be found at JA-294-317.

This supplemental agreement (hereinafter "Agreement"), provided, among other things, that a severance package would be offered to those persons employed in the position of IRD captain. The Union and the hotel also agreed to "red circle" or phase out the captain position over time. *See* McCurley Dec. at ¶19 (JA-321). In addition, the Agreement provided that there would be an increase in the amount of the portion of the service charge paid to servers on a la carte and hospitality orders. The service charge distributed to servers for a la carte orders was to be increased

from 15% to 17% and if no Captain worked the shift, by an additional 2%. For hospitality events, the service charge distributed to the servers increased from 12% to 15%, and if no captain worked the shift, they would receive the captain's 4% portion. *Id*. at ¶20 (JA-322) and Agreement at ¶6 (JA-291). The Agreement further provided that the "Hotel may continue to charge and retain an administrative fee for Hospitality Events and on a la carte transactions above the amounts set forth in Section A.7 and A.8 [of the Agreement] (JA-291), and may also charge and retain an a la carte cover and delivery charge." *See* Agreement at ¶ C.2 (JA-292).

The Agreement was executed by the President of the Union, Mr. Peter Ward, and Mr. Ed Mady, the General Manager of the hotel on May 25, 2011. A true and correct copy of the Agreement is at JA-290-292.

Amedeo complied with the Agreement throughout the time it continued to manage the hotel. *See* McCurley Dec. at ¶22 (JA-322). Following the execution of the Agreement, Union Delegates Magdy Saad and Biswa Saha provided management with a letter further confirming that the employees on the a.m. room service shift had agreed to the May 2011 agreement. *See* McCurley Dec. at ¶23 (JA-322); *see also* Deposition of Chris Stavropoulos at p. 85 (JA-102).

In July 2011, Amedeo ceased its management of the hotel. *See* McCurley Dec. at ¶24 (JA-322). During Amedeo's management of the hotel, the plaintiffs were highly paid, earning well over $80,000 per year in most cases. At all times, the

9

plaintiffs' hourly rates of pay exceeded one and one-half times the minimum wage and more than one-half their compensation came the portions of the service charges that they received from a la carte orders and hospitality functions.  *See* McCurley Dec. at ¶31 (JA-324); *see also* Cecchini Affidavit at ¶¶ 35-37 (JA-340).  A la carte service comprised the bulk of the IRD department's responsibilities.  For a la carte service, the hotel charged a service charge of 17%. All of this amount was distributed to the servers and captains.  The hotel did not retain any portion of this charge. *See* McCurley Dec. at ¶ 26 (JA-323).

The amount of the service charge for a la carte orders was expressly reflected on the IRD menus which were placed in guest rooms for use by guests.  These stated that a "17% gratuity, applicable sales tax and a guest room dining surcharge of $7 per person will be applied to all orders." Although the menu used the term "gratuity," the 17% actually was an automatic or service charge. An excerpt from an IRD menu is attached as Exhibit "4" to Brandon McCurley's Declaration (JA-331).  The room service checks that were signed by guests also expressly referred to the automatic 17% gratuity. *See* McCurley Dec. at ¶ 17 (JA-321).

The hotel also imposed a "guest room dining surcharge" on a la carte orders that was indicated on menus.  This sometimes is referred to as a delivery or cover charge.  The amount of this surcharge was $7.00 during Amedeo's operation of the hotel. *See* McCurley Dec. at ¶ 28 (JA-323).

10

With respect to hospitality functions, the hotel utilized Hospitality Event Orders ("HEOs") as contracts for its guests. These HEO's described the food, beverages and services that would be provided during hospitality and One-on-One events. *Id*. at ¶ 29 (JA-324). From at least as early as 2007, the HEOs included language immediately above the line for the guest's signature that informed the guest that the hotel would retain a 4% administrative fee. *Id*. at ¶ 29 (JA-324). A copy of a representative HEO is at JA-333. *See McCurley Declaration at ¶ 29 (JA-324).* This language stated "[p]lease note that a 23% service charge and 8.875% New York State Sales Tax is applicable to all Food and Beverage charges. Of the 23% service charge, 19% will be distributed to the service staff as gratuity, 4% will be retained by the hotel as administrative fee." *See* McCurley Dec. at ¶35 (JA-325).

The hotel charged an administrative fee on hospitality functions from at least as early as 2007. *See* Deposition of Alphonse Sayot at p. 41 (JA-71). Occasionally, an HEO form would not be utilized. Rather, employees would use a Banquet Event Order ("BEO"). These also advised customers that the hotel was retaining a 4% administrative fee. *See* McCurley Declaration at ¶30 (JA-324). Both BEOs and HEOs were reviewed and acknowledged by guests prior to their event becoming confirmed. This was a regular business practice of the New York Palace Hotel. *Id*. at ¶31 (JA-324).

In addition to the service charge and administrative fee, the hotel on occasion

would charge a "labor" or "butler" fee. This was an hourly charge to a customer for providing a server who would be exclusively stationed as a server in a guest room during a hospitality function. *Id.* at ¶35 (JA-325). This butler or labor fee also was negotiated between the Union and the hotel. Over time, a practice was created between management and labor under which the IRD servers were paid 100% of the butler fee for the first and last hours of a hospitality function, and the fee for the hours in between was split evenly between the servers and the hotel. Captains did not receive a portion of the butler fee. *Id.* at ¶33 (JA-324). The butler fee would appear on an HEO or BEO as a separate charge in the body of the document. It was not part of the service charge. *Id.* at ¶34 (JA-325).

At the conclusion of every shift in the IRD department, the servers would calculate how the service charges and tips were to be distributed among themselves, the captain (if there was one), and the assistant servers. A representative copy of this calculation sheet is at JA-334. *See* McCurley Dec. at ¶35 (JA-325). The calculations on the "tip sheets" were always done by the employees. They were never done by management. Management would become involved only if an employee questioned the amount of the distribution. *Id.* at ¶36 (JA-325). The calculation sheet also included a space for "manager's tip." This represented the administrative fee that was retained by the hotel in connection with hospitality and One-on-One functions. *Id.* at ¶37 (JA-325).

Details regarding the individual Servers and their compensation can be found in JA-403-421. As of 2014, the average Server earned between $90,000 and $150,000 annually. *See* Cecchini Aff. at ¶ 35 (JA-340).

The current claims being made by the Servers under the New York Labor Law ("NYLL") are as follows:

First, the Servers claim that the hotel improperly retained an administrative fee for hospitality events because the documentation provided to customers for these events either failed to disclose that the hotel would retain a portion of the service charge as an administrative fee or included an inadequate notice about the administrative fee. Second, the Servers allege that the hotel allowed captains to retain a portion of the servers' pooled gratuities, when the captains were precluded by the NYLL from participating in this tip pool because the captains were managers and provided minimal direct service to customers. Third, the Servers allege that defendants failed to properly calculate plaintiffs' overtime payments under the NYLL by failing to include in overtime calculations the amounts the Servers claim they should have received; this claim is thus dependent on whether the Servers prevail on one of the first two claims.

The Servers also alleged, for the first time in the summary judgment proceedings and not in any of their Complaints, that the Defendants failed to pay plaintiffs all voluntary gratuities that customers left and that managers improperly

retained a portion of the tip pool. The District Court observed that the claim was too sketchy to determine its basis, and declined to rule on whether it was precluded by the Servers' failure to include it in their complaints. Dist. Ct. Doc. 86 at pp. 16-17.

## SUMMARY OF ARGUMENT

The Servers have benefited from the Union's representation in the form of generous salaries and benefits; they are not working at or near the poverty level, but earn between $90,000 and $150,000 annually. All of the matters complained of in this lawsuit were subjects of the agreements negotiated between the Union and the hotel, which the hotel has always scrupulously observed. When the Servers complained they were not satisfied with the distribution of the service charges, negotiations were held between the Union and the hotel, a resolution was reached in the form of the May 25, 2011, Supplemental Agreement – *and the Servers signed off on this agreement*.

The district court's finding that the Servers' state claims are not preempted by Section 301 of the LMRA is incorrect, and potentially creates a gross injustice. It would be simply wrong for the plaintiffs to be permitted first to agree to a resolution of their claims through the Union and then to file a lawsuit based on the same claims. Amedeo could not arbitrarily change the terms and conditions of the Servers' employment when the Servers were dissatisfied; it was obligated by federal labor law to negotiate any such changes with the Union, which it did. Amedeo cannot be

held liable for adhering to its agreement with the Union, yet that is exactly what the Servers are trying to do.

The Servers never claimed that the May 25, 2011, Agreement was illegal during the negotiations or prior to signing it. Indeed, they agreed to the changes, and then three months later filed a complaint alleging that the policies to which they agreed are illegal. At a minimum, they are complicit in the matter, and to the extent they seek equitable relief, they are barred by the doctrine of unclean hands. *See, e.g.*, *Weiss v. Mayflower Doughnut Corp.*, 1 N.Y.2d 310, 316, 135 N.E.2d 208, 210 (1956) ("The doctrine of unclean hands is ... available when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct.").

In any event, the plaintiffs' claims here are preempted by Section 301 of the LMRA, because the Court cannot determine whether the plaintiffs are entitled to payments under the Supplemental Agreement and IWA without interpreting these contracts. "Section 301 preempts state law claims that involve interpretation of an underlying CBA." *Johnson v. D.M. Rothman Co., Inc.*, 861 F.Supp.2d 326, 331-332 (S.D.N.Y. 2012), citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 413 (1988).

If the district court's ruling were to stand, it would leave in the hands of a state court judge and jury the interpretation of an Industry-Wide Agreement that governs

the labor relationship at the majority of hotels in New York City.

## ARGUMENT

A. <u>The IWA Was Scrupulously Followed, and the Servers Availed Themselves of the Grievance Process Provided in the IWA</u>.

As discussed above, all payments and distributions made by the hotel were made in accordance with the collective bargaining agreements between the Union and the hotel. The Servers nevertheless claim, among other things, that they should also have received the entirety of the service charge, the administrative fee as well as the "guest room dining surcharges" and the "labor fees" charged in conjunction with room service and hospitality events, respectively. These claims were or could have been addressed by their Union pursuant to grievance and arbitration provisions of the IWA and cannot be brought here.

The Servers have benefited from the Union's aggressive representation, and the average Server earned between $90,000 and $150,000 annually as of 2014. *See* Cecchini Aff. at ¶ 35 (JA-340) and Exh. G, thereto (JA-403-421). When the Servers complained about the distribution of the service charges, negotiations were held between the Union and the hotel, and a resolution was reached in the form of the May 25, 2011, Supplemental Agreement (JA-290-292). *See* June 13, 2011, memorandum ("We the Room Service AM shift all agree to the new proposal and are willing to honor the changes that are within said agreement.") (JA-330); *see also*

16

Cecchini Affidavit at ¶¶ 25-33 (JA-338-339); McCurley Dec. at ¶¶ 14- 23 (JA-320-322). Indeed, many of the Servers were Union Delegates, and were directly involved in the grievance and resolution procedure. *See* McCurley Dec. at ¶ 17 (JA-321). Thus, the Union and the Servers reached a negotiated settlement of their concerns and elected not to continue on to arbitration, though they could have done so. The arbitration provision in the IWA is recognized as being one of the most inclusive and comprehensive in the country.[2] *See, e.g.*, *Pitta v. Hotel Ass'n of New York City, Inc.*, 806 F.2d 419, 422 (2d Cir. 1986) ("No grievance – either specific or general – is excluded from this broad coverage."); *cf. Torres v. Four Seasons Hotel of New York*, 277 A.D. 23, 715 N.Y.S. 2d 28 (2000) (claims by room service servers for alleged illegal tip pooling were subject to arbitration under the IWA).

Indeed, the very purpose of arbitration agreements in collective bargaining agreements, such as the one plaintiffs declined to invoke, is to resolve issues like the present ones so that resort to the courts is unnecessary and neither party is penalized for its conduct beyond the parameters of the agreement. "A primary purpose of national labor relations laws is that of settling labor problems by means of

---

[2] "All complaints, disputes or grievances arising between the parties hereto involving questions or interpretation or application of any clause of this Agreement, or any acts, conduct or relations between the parties, directly or indirectly, which shall not have been adjusted by and between the parties shall be referred to a permanent umpire(s) to be known as the Impartial Chairman, and his/her decision shall be final and binding upon the parties hereto." *See* IWA at ¶26(A) (JA-198).

collective bargaining. An increasingly recognized and important policy, as a vital part of the collective bargaining process, is encouragement of arbitration." *Ramsey v. N. L. R. B.*, 327 F.2d 784, 786-787 (7th Cir. 1964). "In [the] field [of collective bargaining,] public policy favors the peaceful resolutions of disputes through arbitration as contrariwise it looks with disfavor on the exaction of penalties." *Matter of Associated Gen. Contractors, New York State Chapter, Inc*., 36 N.Y.2d 957, 959, 335 N.E.2d 859, 859 (1975). Congress expressed a preference for arbitration in the federal labor law itself: "Final adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." 29 U.S.C. § 173(d). "In order to effectuate this policy, this Court has established a strong presumption favoring arbitrability." *Nolde Bros. v. Local No. 358, Bakery & Confectionery Workers Union, AFL-CIO*, 430 U.S. 243, 254 (1977).

The Servers cannot legally or ethically mediate their concerns with the Union, invoking the grievance procedure of the IWA, agree to the resolution thus reached, and then sue the hotel for complying with the collectively-bargained resolution. The Servers never claimed that the May 25, 2011, Agreement was illegal during the negotiations or prior to signing it. Indeed, they agreed to the changes – only now do they claim that the policies to which they agreed are illegal. At a minimum, they are

complicit in the matter and to the extent they seek equitable relief, they are barred by the doctrine of unclean hands. *See, e.g*., *Weiss v. Mayflower Doughnut Corp.*, 1 N.Y.2d 310, 316, 135 N.E.2d 208, 210 (1956) ("The doctrine of unclean hands is ... available when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct.").

B. The Servers' Claims Are Preempted by the LMRA, Because They Require Determination of Whether the Captains Are Managers, and Will Affect the Interpretation of the Overtime Provision of the IWA.

The plaintiffs' claims here are preempted by Section 301 of the Labor-Management Relations Act ("LMRA"), because the Court cannot determine whether the plaintiffs are entitled to payments under the Supplemental Agreement and IWA without interpreting these contracts. "Section 301 preempts state law claims that involve interpretation of an underlying CBA." *Johnson v. D.M. Rothman Co., Inc*., 861 F.Supp.2d 326, 331-332 (S.D.N.Y. 2012), citing *Lingle v. Norge Div. of Magic Chef, Inc*., 486 U.S. 399, 413 (1988). Because the Servers' state law claims are preempted by § 301, the district court has jurisdiction over those claims under the doctrine of complete preemption. *Vera v. Saks & Co*., 335 F.3d 109, 113-114 (2d Cir. 2003).

In *Hoops v. Keyspan Energy*, 822 F.Supp.2d 301 (E.D.N.Y. 2011), the court held an FLSA claim preempted because resolution of the claim required

19

interpretation of the CBA:

> [B]ecause the Plaintiff's entitlement to unpaid overtime under the FLSA hinges on his contractual right to receive night shift differentials in his straight-time wage rate, the Court cannot adjudicate the statutory claim without a ruling on the contract claim. It is the threshold question that must be determined pursuant to the CBA dispute resolution procedures, and therefore the FLSA claim is premature.

*See Hoops,* 822 F.Supp.2d at 307; *see also Johnson*, *supra*, 861 F.Supp.2d at 333 ("To determine whether the Plaintiffs were entitled to grandfather and hi-lo pay, the Court would have to evaluate Plaintiffs' work histories in light of the intended meaning and purpose of the CBA's terms, a task which the Court is ill-equipped to perform, and which the LMRA mandates should be left to the CBA's designated grievance procedures.").

The District Court incorrectly concluded that the Servers' claims do not require interpretation of the IWA's provisions. The Servers are claiming entitlement to portions of the administrative fee that were retained by the Hotel as well as the portion of the service charge distributed to captains. Both of these subjects were extensively negotiated by the Union and the Hotel and ultimately memorialized in the Supplemental Agreement. As shown below, in order to assess the validity of the claims, the court or jury will have to rewrite the IWA's provisions to consider how the Servers' claims would impact them, and in doing so will upset the balance reached by the parties during their collective bargaining negotiations – not only for

the New York Palace, but for all of the other hotels governed by the IWA.

Congress and the Supreme Court have recognized the importance of the collective bargaining process, and in particular, multi-employer bargaining, in maintaining labor peace and the benefits of the process for employees and employers alike. *See, e.g., Nat'l Labor Relations Bd. v. Truck Drivers Local Union No 449, Int'l Bhd. of Teamsters, Chauffeurs Warehousemen, & Helpers of Am. A.F.L.*, 353 U.S. 87, 95-96 (1957) ("*Buffalo Linen*"), cited in *Nat'l Basketball Ass'n v. Williams*, 45 F.3d 684, 689-690 (2d Cir. 1995) ("In 1947, Congress refused to limit multiemployer bargaining because it concluded that such bargaining 'was a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining'."); *see also Gen. Teamsters Local Union No. 174 v. N.L.R.B.*, 723 F.2d 966, 971 (D.C. Cir. 1983) (citations omitted) ("Both multiunion and multiemployer bargaining ... [have] been widely recognized as an effective way to create stability in collective-bargaining relationships and 'a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining'.").

Changing the interpretation of these provisions as the Servers want will damage the *quid pro quo* nature of bargaining and throw off the balance between the parties:

> The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a

myriad of cases which the draftsmen cannot wholly anticipate. The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant.

*United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 578-580 (1960) (citations omitted). "[A] collective bargaining agreement differs 'in nature, scope, and purpose from the ordinary commercial contract'. … Each covenant in a collective agreement represents a *quid pro quo,* and we must strictly adhere to the letter of the parties' bargain in view of the spirit which effects it: the expectation that the contract will be enforced." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Mack Trucks, Inc.*, 820 F.2d 91, 96 (3d Cir. 1987). "The parties' … agreement is made on the understanding and with the expectation that both parties will respect it as a commitment binding upon them. In the business world such commitments are called contracts. … Collective bargaining is today … the means of establishing industrial democracy as the essential condition of political democracy, the means of providing for the workers' lives in industry the sense of worth, of freedom, and of participation that democratic government promises them as citizens." Harry Shulman, *Reason, Contract, and Law in Labor Relations,* 68 Harv. L. Rev. 999, 1001-1002 (1955) (citation omitted).

As shown below, the Servers' claims potentially threaten the integrity of the IWA; at a minimum, assessing them requires application and interpretation of some

of its provisions.

**The Captains' Share of the Service Charge**. The collectively agreed-to resolution of the Servers' grievance, the May 25, 2011, Agreement, granted the Servers additional shares of the service charge in numerous situations, and called for phasing out the captain position, but continued to recognize that the captains as well as the Servers provided service to the hotel's customers and were members of the Union, and thus continued to provide for the captains to receive a portion of the service charge. *See* JA-290-292. The Servers *agreed* to this resolution before challenging in this lawsuit the captains' right to share in the service charge.

The Servers' claim that the Captains should not have been entitled to any share of the service charge is based on their assertion that the captains were managers, and did not provide "service", but both the Union and hotel – including these Servers – agreed otherwise, both in negotiating the original agreements governing the hotel's employees and when they signed off on the Agreement that was reached following the Servers' grievance.

The question of whether individual employees are supervisors or managers is of enormous importance under the National Labor Relations Act, which explicitly guarantees coverage for employees, but precludes it for supervisors. *See* 29 U.S.C. § 157 ("Employees shall have the right to self-organization....") and 29 U.S.C. § 152(3) ("The term 'employee' ... shall not include ... any individual employed as a

supervisor ...."). *See also* 29 U.S.C. § 152(11) (defining the term "supervisor" as any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment). "Supervisors would fall within the class of employees, were they not expressly excepted from it." *N.L.R.B. v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706, 711 (2001).

The question of whether the captains are managers, and thus precluded from sharing in the tip pool, is a key element of the Servers' claim that they should have been entitled to receive the captains' share of the service charges. It also directly affects the relationship between the Union and the hotel, and is a crucial question of federal labor law; if the captains are managers, they are not entitled to be represented by the Union in the first place. *Cf., e.g., CGLM, Inc. & Alan Kansas, an Individual*, 2007 WL 633122 (NLRB Div. of Judges Feb. 27, 2007) (concluding that individual at issue was not a statutory supervisor and thus was entitled to be included in the bargaining unit). The District Court's holding that this claim is not preempted will leave this crucial question in the hands of a state court judge or jury.

Both the Union and the hotel, in negotiating the agreements which provided

for the captains' role in the IRD service, and the captains' compensation therefrom, determined that the captains are not managers, that they play a role in the service of the guests, and that they are accordingly entitled to share in the service charge. To allow a state court jury to conclude otherwise will require a finding that both the hotel and the Union incorrectly judged the captains' role and the value the captains brought to the service process, and will interfere with the *quid pro quo* balance between the parties as reflected in the agreements between the hotel and the Union.

**The Overtime Claim**. The IWA clearly states how overtime will be paid:

> Overtime at the rate of time and one-half shall be paid for all hours worked in excess of eight (8) hours per day or forty (40) hours per week in categories where the regular work week under this Agreement is forty (40) hours per week and for all hours worked in excess of seven (7) hours per day or thirty-five (35) hours per week in categories where the regular work week under this Agreement is thirty-five (35) hours per week.

*See* IWA ¶ 11(G) (1) (JA-188). There is no dispute that the Servers never objected to the overtime they were paid, which complied with the terms of the IWA. *See* D.Ct. Doc. 70-3, Cecchini Aff. at ¶ 46 (JA-341), citing IWA ¶ 11(G) ("Overtime").

The Servers are alleging that the IWA must be interpreted to mean that their regular rate properly includes the service charges that they were not awarded. Such an interpretation would dramatically affect the meaning of the language of this provision of the IWA – which would affect not only the New York Palace, but 60% of the hotels in New York City. *Cf., e.g., Bermuda Container Line Ltd. v. Int'l*

25

*Longshoremen's Ass'n, AFL-CIO*, 1997 WL 795766, at *9 (S.D.N.Y. Dec. 29, 1997) (defendant's proffered interpretation of the multi-employer agreement would throw the industry into disarray, "the usefulness of collective bargaining in the shipping industry would be eliminated … [and] there would be widespread loss of ILA jobs, specifically what multi-port collective bargaining aimed to prevent.  Such a decision would undermine decades of labor relations in the shipping industry. … Were the Court to uphold BCL's position, it would undo years of progress towards peace in the shipping industry by creating unrest in that industry such as the nation has not seen since the 1960's.").

**Allegation Regarding Voluntary Tips**.  As the District Court observed, the Servers' claim that they did not receive all voluntary tips and that managers retained a portion of the tip pool, is very vague.  Moreover, as Amedeo and NWPH observed in the summary judgment pleadings, this allegation is one that is not included in any of the Servers' complaints, and should not even be considered.  *See* Dist. Ct. Doc. 84 at p. 4 (noting that the entire allegation is based on four lines of unsupported, self-serving testimony from a single Server, and was never raised before the summary judgment stage).  "A claim must be set forth in the pleadings, in order to give defendants fair notice of the nature of the plaintiff's claim.  Thus, it is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion." *Thomas v. Egan*, 1 F. App'x 52, 54 (2d Cir. 2001).  "It is black

letter law that a party may not raise new claims for the first time in opposition to summary judgment." *Brandon v. City of New York*, 705 F. Supp. 2d 261, 278 (S.D.N.Y. 2010).

The District Court declined to determine whether the Servers' claim that, if even viable, is preempted by § 301 of the LMRA. The judge concluded that it would be preempted to the extent it is based on their rights under the collective bargaining agreement between the hotel and the Union, but that it was too vague to make a determination. *See* D. Ct. Doc. 86 at pp. 16-17 (JA-528-529). In fact, the claim should not be considered at all, because it was not timely made; it is in any event, preempted like the other claims pursuant to the LMRA.

## CONCLUSION

The Servers' claims under the NYLL are preempted by the LMRA. Remanding the Servers' claims will result in a state judge or jury potentially annulling key portions of a labor agreement that was collectively bargained both between the hotel and the Union, and specifically ***with these plaintiffs***. Moreover, this consequence would affect not only the New York Palace, but the majority of hotels in New York City, a clearly intolerable result. For the foregoing reasons, Defendant/Appellant Amedeo respectfully requests that this Court REVERSE the decision of the District Court holding that the Plaintiffs/Appellees' claims are not preempted by the § 301 of the Labor-Management Relations Act, remand the case

to the District Court for a ruling on the Defendants' Motions for Summary Judgment,

and grant Defendant/Appellant such other relief as the Court may deem appropriate.

*/s/ John R. Hunt*

_____

Paul E. Wagner, Esq.
John R. Hunt, Esq.
Stokes Wagner, ALC

*Attorneys for Defendants/ Appellants,*
*Amedeo Hotels Limited Partners*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing Initial Brief of Defendant/Appellant, Amedeo Hotels Limited Partners, complies with the type-volume limit of Fed.R.App.P. 32(a)(7)(B), because excluding the parts of the document exempted by Fed.R.App.P. 32(f), this document contains 6,813 words.

I hereby certify that the foregoing Initial Brief of Defendant/Appellant, Amedeo Hotels Limited Partners, complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type-style requirements of Fed.R.App.P. 32(a)(6) because this document was typed in 14-point Times New Roman font**.**

*/s/ John R. Hunt*

_____

Paul E. Wagner, Esq.
John R. Hunt, Esq.
Stokes Wagner, ALC

*Attorneys for Defendants/ Appellants,*
*Amedeo Hotels Limited Partners*

October 16, 2017

29

**SPECIAL APPENDIX**

## Table of Contents

**Page**

Memorandum & Order of the Honorable Joan M. Azrack,
    dated March 29, 2016, Appealed From ........................................   SPA1

Judgment of the United States District Court,
    Eastern District of New York, entered March 30, 2016,
    Appealed From ..........................................................................   SPA23

Notice of Appeal, dated April 27, 2016 ............................................   SPA24

Case 1:12-cv-04418-JMA   Document 86   Filed 03/29/16   Page 1 of 22 PageID #: 1857

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------X

RUBEN DIAZ, RENE FERNANDEZ,
MOHAMMED ISMAT, PRADIP SAHA,
RAMANDRA SAHA, MAXINE SMITH,
ABDUR RAQUIB, JOHNNY RAMIREZ,
MADGY SAAD, WALTER FREIRE,
MOZIBUR RAHMAN, CHRISTOPHER
STAVROPOULOS, ABDUR RAHMAN,
SYED AHMED, WALTER GARCIA,
ASHIF MIRU, BISWA SAHA, SAYOT
ALPHONSE, ALBERTO PRADO, MAURICE
SCHWARTE, ABELLA BOUALE, DENZIL
HANNAH, MILAD BARSOUM,
MOAZZEMUL HAQUE, and ARUN SAHA,

Plaintiffs,

-against-

AMEDEO HOTELS LIMITED
PARTNERSHIP, NWPH, LLC,
and NORTHWOOD HOSPITALITY, LLC,

Defendants.

------------------------------------------------------X

For Online Publication Only

**MEMORANDUM &
ORDER**
12-CV-4418 (JMA)

**FILED
CLERK**

3/29/2016 1:35 pm

**U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE**

APPEARANCES:

David C. Wims
Law Office of David Wims
1430 Pitkin Avenue, 2nd Floor
Brooklyn, NY 11233
    *Attorney for Plaintiffs*

John Hunt
Stokes Wagner Hunt Maretz & Terrell
1201 W. Peachtree Street, Suite 2400
Atlanta, GA 30309
    *Attorney for Defendant Amedeo Hotels Limited Partnership*

Judith Stoll and Alexander Soric
Kane Kessler, P.C.
1350 Avenue of the Americas
New York, NY 10019
    *Attorneys for Defendants NWPH, LLC, and Northwood Hospitality, LLC*

1

**AZRACK, United States District Judge:**

The plaintiffs in this wage-and-hour suit are room service waiters at the New York Palace Hotel.  Plaintiffs allege that the defendants, who operated the hotel, violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., and the New York Labor Law ("NYLL"), §§ 190 et seq., by not paying plaintiffs all gratuities to which they were entitled and miscalculating plaintiffs' overtime payments.  Defendants have moved for summary judgment. For the reasons stated below, the Court grants defendants summary judgment on plaintiffs' claim under the FLSA, rejects defendants' argument that plaintiffs' NYLL claims are preempted by federal law, and declines to exercise supplemental jurisdiction over plaintiffs' NYLL claims.

## I. BACKGROUND

Plaintiffs are current and former employees of the New York Palace Hotel (the "Hotel"). Defendant Amedeo Hotels Limited Partnership ("Amedeo") operated the Hotel until July 2011, at which point the Hotel's operation was taken over by defendants NWPH, LLC, and Northwood Hospitality, Inc. (collectively "NWPH").  (Pls. Rule 56.1 Counterstatement in Response to Amedeo's 56.1 Statement ("Pls. Amedeo 56.1") ¶ 1, ECF No. 82; Pls. Rule 56.1 Counterstatement in Response to NWPH's Rule 56.1 Statement ("Pls. NWPH 56.1") ¶ 4, ECF No. 81.)

Plaintiffs worked as "servers" in the Hotel's In Room Dining Department ("IRDD") and delivered food to guests who ordered room service.  (Pls. Amedeo 56.1 ¶¶ 2–7.)  The servers also worked hospitality functions, which included social events that are held in guest rooms, as well as corporate events in which corporate clients rent a block of rooms.  (Id. ¶ 4.)  The IRDD also employed individuals in the role of "captains." (Id. ¶¶ 5, 8.)

2

When guests order room service, the Hotel charges a mandatory gratuity. (Id. ¶¶ 33–34.) When clients book hospitality functions, the Hotel's contracts with the clients include a mandatory service charge. (Id. ¶¶ 35–38; see also Decl. of David C. Wims ("Wims Decl.") Ex. 1, ECF No. 82.) Since at least 2000, the Hotel has retained 4% of the hospitality service charge. (June 2000 Agreement, Decl. of Alyssa Tramposch ("Tramposch Decl.") Ex. A, ECF No. 79.) Some of the Hotel's hospitality contracts state that the Hotel would retain this 4% as an administrative fee. (Pls. Amedeo 56.1 ¶¶ 36–37.) However, since 2005, at least some of the Hotel's hospitality contracts failed to inform customers that 4% of the service charge would be retained by the Hotel as an administrative fee. (Id. ¶ 36; Wims Decl. Ex. 1.) The Hotel also added other surcharges and fees to room service and hospitality purchases, including an hourly charge for servers who worked hospitality events, known as the "labor" or "butler" fee. (Pls. Amedeo 56.1 ¶¶ 40–42.)

The servers and captains were both represented by the New York Hotel Trades Council, AFL-CIO and Local 6 of Unite Here! (the "Union"). (Id. ¶ 10.) The Hotel and the Union were parties to the Industry Wide Agreement ("IWA"), a collective bargaining agreement that covered multiple employers in the hotel industry. (Id.) The Union and the Hotel also entered into various supplemental agreements that detailed the compensation of the servers and captains and included formulas for the sharing of service charges and gratuities amongst the servers and the captains. (Id. ¶¶ 13–26; June 2000 Agreement; May 2011 Agreement, Tramposch Decl. Ex. B.) The most recent supplemental agreement was consummated in May 2011 (the "May 2011 Agreement").

The genesis of the May 2011 Agreement dates back to 2010 when the Hotel's management learned that the Union wanted to bargain about a dispute concerning the servers.

3

(Pls. Amedeo 56.1 ¶ 15.)   In May 2010, numerous servers had sent the Union a letter complaining that the Hotel had violated the collective bargaining agreement by, inter alia, not paying the servers the full amount of the service charge listed on "checks" for hospitality events. (May 2010 Ltr., Decl. of Brandon McCurley ("McCurley Decl.") Ex. 1, ECF No. 79; Pls. Amedeo 56.1 ¶¶ 15–16.) This letter was ultimately forwarded to the Hotel's management. (Pls. Amedeo 56.1 ¶ 15.)  The Hotel and the Union then bargained over issues raised by the Union. (Id. ¶ 17.)  Multiple bargaining sessions, which many of the plaintiffs attended, culminated in the 2011 Agreement between the Union and the Hotel.  (Id. ¶¶ 18–26.)  The servers then agreed to ratify this agreement, with 21 of the current plaintiffs casting written ballots in favor of the agreement.  (Id. ¶ 22.)  The Union delegates for the servers who worked during the Hotel's morning shift also signed a letter indicating that those employees agreed to the May 2011 Agreement.  (Id. ¶ 29.)

The May 2011 Agreement increased service charges for guests, revised the distribution formula for gratuities, and included provisions aimed at phasing out the captain position, including a severance package offer that would be extended to the captains.  (May 2011 Agreement).  The May 2011 Agreement also stated that the Hotel could continue to "charge and retain" an administrative fee for hospitality events over and above the gratuity amounts that plaintiffs were entitled to under the May 2011 Agreement.  (Id.)

In September 2011, plaintiff Ruben Diaz and thirteen other servers filed suit against Amedeo and NWPH in New York State Supreme Court, Kings County, alleging various violations of the NYLL.  Eleven additional plaintiffs subsequently joined this action.  In August 2012, plaintiffs filed a third amended complaint, which added a claim for unpaid overtime under the FLSA.  Defendants then removed the action to this Court, citing federal question jurisdiction

based on the FLSA claim.  In March 2013, plaintiffs sought to amend the complaint to add "collective allegations" and pursue a collective action under the FLSA.  (ECF No. 25.)  In April 2013, the Court denied this request.  (ECF No. 32.)  Currently before the Court are defendants' motions for summary judgment.

## II. DISCUSSION

### A. Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating that "no genuine issue of material fact exists."  Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

"An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" "while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "When ruling on a summary judgment motion, [the court] must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).

### B. Overview of Plaintiffs' Claims

Amedeo and NWPH have separately moved for summary judgment on plaintiffs' FLSA claim and NYLL claims.  In response to defendants' motions, plaintiffs withdrew a number of claims.  Still pending is plaintiffs' claim that defendants violated the FLSA by not properly

5

calculating plaintiffs' overtime payments.  Plaintiffs are also still pursuing four alleged violations

of the NYLL.  First, plaintiffs claim that defendants improperly retained an administrative fee for

hospitality events because the documentation provided to customers for these events either failed

to disclose that the Hotel would retain a portion of the service charge as an administrative fee or

included an inadequate notice about the administrative fee.   Second, plaintiffs allege that

defendants allowed captains to retain a portion of the servers' pooled gratuities when the captains

were precluded, under the NYLL, from participating in this tip pool because the captains were

managers and provided minimal direct service to customers.   Third, plaintiffs allege that

defendants failed to properly calculate plaintiffs' overtime payments under the NYLL.  Fourth,

plaintiffs claim that defendants failed to pay plaintiffs all voluntary gratuities that customers left

and that managers improperly retained a portion of the tip pool.  (See Pls. Mem. at 8–9, ECF No.

90.).

        As explained below, defendants are entitled to summary judgment on plaintiffs' FLSA

claim.  Amedeo also argues that plaintiffs' NYLL claims are preempted by § 301 of the Labor

Management Relations Act ("LMRA"), 29 U.S.C. § 185.  The Court disagrees and concludes

that, with one minor exception, plaintiffs' NYLL claims are not preempted.  Because plaintiffs'

FLSA claim is being dismissed and Amedeo's federal preemption argument fails, the Court

declines to exercise supplemental jurisdiction over the NYLL claims.

**C.  Plaintiffs' FLSA Claim**

        Plaintiffs allege that they are entitled to overtime under the FLSA.  Defendants counter

that plaintiffs are exempt from overtime under the FLSA because plaintiffs all qualify for the

FLSA's commissioned salesperson exemption, 29 U.S.C. § 207(i) (the "7(i) exemption").

Mandatory service charges for waiters that are calculated as a percentage of a total banquet bill

qualify as commissions for purposes of the 7(i) exemption. See Mechmet v. Four Seasons Hotels, Ltd., 825 F.2d 1173, 1178 (7th Cir. 1987). Defendants bear the burden of proving that plaintiffs qualify for the 7(i) exemption. See Reiseck v. Universal Commun. of Miami, Inc., 591 F.3d 101, 104 (2d Cir. 2010). "Because the FLSA is a remedial law," courts "narrowly construe" exemptions under the FLSA. Id.

For an employee to be exempt under 7(i), the employee must, inter alia, receive more than half of his total compensation from commissions. 29 U.S.C. § 207(i). Here, the parties dispute whether plaintiffs received more than half of their total compensation from commissions. As explained below, defendants have met their burden on this element and are entitled to summary judgment on plaintiffs' FLSA claim.

Plaintiffs concede that "[d]efendants' records demonstrate that more than half of Plaintiffs' cash compensation for employment comes from service charge[s] or commissions."[1] (Pls. Mem. at 16 (emphasis in original).) In light of this concession, plaintiffs focus their argument on the non-monetary compensation they received. According to plaintiffs, the calculation of their total compensation for purposes of the 7(i) exemption must include their non-monetary compensation–a point defendants dispute. Specifically, plaintiffs' brief points to complimentary meals as well as CBA-mandated benefit contributions that the Hotel makes towards the Union's health, pension, prepaid legal, and training and scholarship funds. (IWA at B-1–B-13, Decl. of John Hunt. Ex. 6, ECF No. 78.) These CBA-mandated benefit contributions are equal to approximately 30% of plaintiffs' monetary compensation. (Pls. Mem. at 16–17.) If these benefit contributions are included in the calculation of plaintiffs' total compensation for

---

[1] In addition to plaintiffs' concession in their brief, numerous plaintiffs also conceded this point at their depositions. (See Amedeo Mem. at 8 n.9 (citing deposition testimony), ECF No. 76.)

7

purposes of the 7(i) exemption, many of the plaintiffs would not qualify for the 7(i) exemption.

(Id.)

Plaintiffs' argument about meals can be disposed of summarily.  As defendants point out,

there is no evidence in the record about plaintiffs receiving any meals.

Plaintiffs' argument that the CBA-mandated benefit contributions should be included in

the calculation of total compensation also fails.  Notably, plaintiffs simply ignore the statutory

provisions and regulations applicable to such contributions.  29 C.F.R. § 779.415 states, in

relevant part, that:

> In determining for purposes of [the 7(i) exemption] whether more than half of an
> employee's compensation 'represents commissions on goods or services' it is
> necessary first to total all compensation paid to or on behalf of the employee as
> remuneration for his employment during the period.  All such compensation in
> whatever form or by whatever method paid should be included, whether
> calculated on a time, piece, incentive or other basis, and amounts representing any
> board, lodging or other facilities furnished should be included in addition to cash
> payments . . . .  Payments excludable from the employee's 'regular rate' under [29
> U.S.C. § 207(e)] may be excluded from this computation if, but only if, they are
> payments of a kind not made as compensation for his employment during the
> period.  (See part 778 of this chapter.)

29 C.F.R. § 779.415(a) (emphasis added).

29 U.S.C. § 207(e)(4) excludes from an employee's "regular rate" "contributions

irrevocably made by an employer to a trustee or third person pursuant to a bona fide plan for

providing old-age, retirement, life, accident, or health insurance or similar benefits for

employees."  Id. Another regulation, 29 C.F.R. § 778.215, spells out various requirements for an

employer's contribution to qualify as excludable from an employee's "regular rate" under 29

U.S.C. § 207(e)(4).  These requirements include, inter alia, that: "contributions must be made

pursuant to a specific plan or program adopted by the employer, or by contract as a result of

collective bargaining"; the "primary purpose of the plan must be to provide systematically for the

8

payment of benefits to employees on account of death, disability, advanced age, retirement, illness, medical expenses, hospitalization, and the like"; and the "employer's contributions must be paid irrevocably to a trustee or third person pursuant to an insurance agreement, trust or other funded arrangement." 29 C.F.R. § 778.215.

Only a few decisions have analyzed these provisions and none of those cases involve the 7(i) exemption. See, e.g., Madison v. Resources for Human Dev., Inc., 233 F.3d 175, 184–87 (3d Cir. 2000) (addressing cafeteria benefit plan that allowed employees to receive a cash payment in lieu of benefits and explaining that 29 C.F.R. § 778.215 is "merely an interpretative guideline of the agency," not a "formal agency regulation")[2]; Barnes v. Akal Sec., Inc., No. 04-1350, 2005 WL 1459112, at *2–3 (D. Kan. June 20, 2005).

The Court has reviewed Schedule B of the IWA, which addresses these contributions, and concludes that these contributions satisfy the requirements of both 29 U.S.C. § 207(e)(4) and 29 C.F.R. § 778.215. As noted earlier, plaintiffs completely ignore this statute and regulation, and do not advance any arguments as to why the contributions at issue should be included in the compensation calculation under these governing provisions.

The Court also concludes that defendants have satisfied 29 C.F.R. § 779.415's additional requirements that the contributions at issue were "payments of a kind not made as compensation for . . . employment during" the relevant "period[s]" in which they were made. 29 C.F.R. § 779.415. These contributions were made by the Hotel to the various benefit funds—they were not paid to the employees as compensation. (See also NWPH Mem. at 12 (addressing this regulation), ECF No. 73) Again, plaintiff does not offer any argument as to why these contributions fail to meet the requirement set out in 29 C.F.R. § 779.415.

---

[2] None of the funds at issue here allow employees to receive cash in lieu of benefits. (See IWA, Schedule B ¶ 8(c).)

9

Finally, plaintiffs' brief states: "Defendants admit that the 'labor fees' plaintiffs [were paid] are hourly compensation, as opposed to commissions on goods or services." (Pls. Mem. at 17.) Other than simply reciting this fact, plaintiffs say nothing else about this point and do not advance any argument concerning this admission. Accordingly, the Court declines to consider this point further.[3]

For the reasons stated above, the Court grants defendants summary judgment on plaintiffs' FLSA claim.

## D. **Preemption Under § 301 of the LMRA**

Because all of plaintiffs' federal claims have now been dismissed, the Court turns to the question of whether it is has jurisdiction over the remaining state law claims. When all of a plaintiff's federal claims are dismissed at summary judgment, district courts routinely decline to exercise supplemental jurisdiction over any remaining state law claims.[4] (See discussion infra.)

In this case, there is a jurisdictional wrinkle because although only plaintiffs' state law claims remain, Amedeo has argued that those state law claims are preempted by § 301 of the LMRA. If a plaintiff's state law claim is, in fact, preempted by § 301, then a federal court would have jurisdiction over that claim under the doctrine of complete preemption. Vera v. Saks & Co., 335 F.3d 109, 113–14 (2d Cir. 2003). Here, neither defendant has explicitly invoked § 301 preemption as a basis for federal jurisdiction—the only basis for jurisdiction cited in defendants' removal notice was federal question jurisdiction based on plaintiffs' FLSA claim. Nevertheless,

---

[3] The Court notes that, in arguing that the Hotel's benefit-plan contributions should be factored into plaintiffs' total compensation, plaintiffs' brief includes a chart indicating that, if those contributions are included in plaintiffs' compensation, they would not qualify for the 7(i) exemption. Plaintiffs, however, say nothing about the amount of labor fees they received or how those fees might alter the 7(i) calculus.

[4] The only party to address the question of supplemental jurisdiction is NWPH, which argues in its reply brief that, if the FLSA claim is dismissed on summary judgment and any state law claims survive, then the Court should decline to exercise supplemental jurisdiction over the surviving state law claims.

10

the Court believes it is appropriate to address Amedeo's § 301 preemption argument, which, as explained below, is not persuasive.

### 1. Standard for § 301 Preemption

Section 301 of the LMRA states that "[s]uits for violation of contracts between an employer and a labor organization . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). Section 301 has been interpreted to preempt state-law "'claims founded directly on rights created by collective-bargaining agreements, and also claims "'substantially dependent on analysis of a collective-bargaining agreement.'" Caterpillar Inc. v. Williams, 482 U.S. 386, 394 (1987) (quoting Electrical Workers v. Hechler, 481 U.S. 851, 859, n.3 (1987)). "When a state law claim alleges a violation of a labor contract or when the resolution of a state law claim depends on an interpretation of a collective bargaining agreement, Section 301 preempts that claim." Alderman v. 21 Club Inc., 733 F. Supp. 2d 461, 467–68 (S.D.N.Y. 2010) (citing Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 261 (1994)). "Federal law preempts such state claims to further the federal goal of developing a uniform federal common law to govern labor disputes, 'lest common terms in bargaining agreements be given different and potentially inconsistent interpretations in different jurisdictions.'" Vera v. Saks & Co., 335 F.3d 109, 114 (2d Cir. 2003) (quoting Livadas v. Bradshaw, 512 U.S. 107, 122 (1994)).

However, if state law establishes enforceable rights that "are independent of a labor contract, actions to enforce such independent rights or rules would not be preempted by section 301" unless the resolution of the state law claim will be substantially dependent on an analysis of a collective bargaining agreement. Vera, 335 F.3d at 115. Moreover, the "bare fact that a

11

collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not" trigger § 301 preemption. Livadas, 512 U.S. at 124.

While "[t]he boundary between claims requiring 'interpretation' of a CBA and ones that merely require such an agreement to be 'consulted' is elusive," § 301 preemption is not triggered by "simple reference to the face of the CBA." Wynn v. AC Rochester, 273 F.3d 153, 158 (2d Cir. 2001) (per curiam). "For example, § 301 does not mandate preemption of state law claims requiring 'mere referral' to a CBA to determine damages owed." Johnson v. D.M. Rothman Co., Inc., 861 F. Supp. 2d 326, 332 (S.D.N.Y. 2012) (quoting Vera, 335 F.3d at 115). On the other hand, a NYLL claim will be preempted where it "require[s] substantial analysis of the CBA." Vera, 335 F.3d at 116.

### 2. Analysis

Amedeo raises several arguments as to why § 301 preemption applies. The Court addresses each argument in turn.

#### i. The Preemption Cases Cited by Amedeo Are Clearly Distinguishable

Amedeo's primary argument is that § 301 preemption applies here because "the Court cannot determine whether the plaintiffs are entitled to payments under the [May 2011 Agreement] and IWA without interpreting these contracts." (Amedeo Mem. at 13–14, ECF No. 76.) Amedeo is, with one minor exception, wrong. Plaintiffs' rights to any additional compensation stem solely from the NYLL, not from the CBAs. And, plaintiffs' NYLL claims do not substantially depend on an analysis of the CBAs.

In support of its preemption argument, Amedeo cites two purportedly analogous cases, Johnson v. D.M. Rothman Co., Inc., 861 F. Supp. 2d 326, 328 (S.D.N.Y. 2012), and Hoops v. Keyspan Energy, 822 F. Supp. 2d 301 (E.D.N.Y. 2011). According to Amedeo, like Hoops and

Johnson, this Court "would be required to review and interpret a collective bargaining agreement to determine whether the plaintiffs are entitled [to the administrative fee and the captain's portion of the service charges] in light of the contract's history and the meaning of the provisions creating and interpreting those categories of charges . . . ." (Amedeo Mem. at 14.)

Both Johnson and Hoops are clearly distinguishable from the instant suit. In those cases, the plaintiffs claimed that their employers failed to pay them certain compensation due under a CBA and then violated the FLSA and NYLL by not factoring that unpaid compensation into their overtime pay. In both cases, the courts concluded that the plaintiffs' claims were preempted by § 301 because determining the threshold question of whether the plaintiffs were entitled to the unpaid compensation under their CBAs required interpretation and application of the CBAs. Johnson, 861 F. Supp. 2d at 328 (finding certain statutory claims preempted because, to determine whether the plaintiffs were entitled to the unpaid compensation at issue, the court would have to interpret ambiguous terms of the collective bargaining agreement); Hoops, 822 F. Supp. 2d at 307 ("[B]ecause the Plaintiff's entitlement to unpaid overtime under the FLSA hinges on his contractual right to receive night shift differentials in his straight-time wage rate, the Court cannot adjudicate the statutory claim without a ruling on the contract claim."). By contrast, here, plaintiffs are not claiming that defendants failed to pay any compensation owed under the CBAs. Rather, plaintiffs are simply claiming that they are owed additional compensation under the NYLL, over and above the amounts that the Hotel has already paid pursuant to the CBAs.

Furthermore, as explained below, closer examination of each of plaintiffs' NYLL claims confirms that those claims are, with one minor exception, not preempted by § 301.

13

### ii. The Administrative Fee Claim

Plaintiffs claim that, under NYLL § 196-d, they are owed additional gratuities from hospitality events because the Hotel failed to adequately inform its customers that a portion of the service charge would be retained by the Hotel as an administrative fee. The May 2011 Agreement confirms that the Hotel "may continue to charge and retain an administrative fee for Hospitality Events and on [room service] transactions above" the specific percentages that the servers and captains are entitled to receive under the May 2011 Agreement.   The prior supplemental agreement also stated that the Hotel would retain 4% of the hospitality service charge.   (June 2000 Agreement ¶ 9(a) (stating that 4% of hospitality gratuities would be distributed to managers).)  These provisions, however, are irrelevant to plaintiffs' claim that they are entitled, under the NYLL, to the administrative fee that the Hotel retained. Accordingly, this statutory claim is not preempted by § 301.  See Alderman, 733 F. Supp. 2d at 467 (rejecting similar argument and finding no preemption where the plaintiffs sought, under the NYLL, portions of service charges that they were not entitled to under their CBA).

### iii. The Claim that Captains Improperly Participated in the Tip Pool

Plaintiffs also claim that they are entitled, under NYLL § 196-d, to the portions of the gratuities and service charges that the captains received because the captains were not eligible under the NYLL to share in these gratuities.  Plaintiffs' purported right to these gratuities arises under the NYLL and not the CBAs.  Thus, § 301 preemption would only apply here if plaintiffs' claim was substantially dependent on an analysis of the CBAs. As explained below, although the CBAs may need to be referenced to resolve this NYLL claim, § 301 preemption does not apply because the meaning of the CBA provisions at issue are clear and not disputed.

14

The Union agreed in the CBAs that the captains would share in the tip pool along with the servers. To resolve plaintiffs' NYLL claim, the CBAs, which contain this tip-pooling agreement, will likely have to be referenced because this tip-pooling agreement appears to have some relevance to the plaintiffs' claim. NWPH argues that, under the NYLL, if servers who receive tips agree in a collective bargaining agreement to share the tips, then the servers may include any other employees that they wish in the tip pool.[5] (NWPH Mem. at 20–21; NWPH Reply Mem. at 7–9, ECF No. 74.) And, even if NWPH is incorrect on this point of state law, the fact that the Union agreed in the CBAs to the tip-pooling arrangement would still appear to have some relevance to plaintiffs' NYLL claim because the relevant regulations promulgated by the New York Department of Labor treat employer-mandated tip-pooling differently, in certain respects, than voluntary tip-pooling. See N.Y. Comp. Codes R. Regs. tit. 12, §§ 146–2.14, 2.15, 2.16. Although addressing the merits of plaintiffs' claim will likely require reference to the CBAs, that alone is not enough to trigger preemption because a substantial analysis of the CBAs is not necessary. The parties do not dispute that the Union, which represented the plaintiffs, agreed in the CBAs that the servers and captains would share gratuities pursuant to the formulas set out in the CBAs. (See, e.g., Pls. Amedeo 56.1 ¶ 25.) Where a defendant asserts that a state law claim will involve interpretation of a CBA, but "the meaning of" the "plain language" of a provision is "clear" or undisputed, then the state law claim is not preempted by § 301. Johnson, 861 F. Supp. 2d at 334; see also Wynn v. AC Rochester, 273 F.3d 153, 158 (2d Cir. 2001) (holding that state law fraud claim was not preempted because the defendant did not dispute the plaintiff's interpretation of the CBA, which was compelled by the CBA's "plain language"). Although the parties dispute the effect of the CBAs' tip-pooling agreements under New York

---

[5] Only NWPH, which did not raise a preemption argument, contends that, under the NYLL, the Union's consent to the tip pooling arrangement precludes plaintiffs' claims about the captains' share of the tips. Amedeo does not advance this argument.

15

law, the existence of these tip-pooling agreements is both clear and undisputed. Accordingly, this claim is not preempted by § 301.

### iv. The Overtime Calculation Claim

Plaintiffs also maintain that defendants violated the NYLL by not properly calculating plaintiffs' overtime payments. Specifically, plaintiffs claim that their overtime payments failed to account for service charges and gratuities that the Hotel has already paid to plaintiffs pursuant to the CBA. This claim is clearly not preempted by § 301. See Isaacs v. C. Parking Sys. of New York, Inc., No. 10-CV-5636, 2012 WL 957494, at *5 (E.D.N.Y. Feb. 27, 2012) (finding overtime claim not preempted where the court was required only "to determine whether shift differentials and longevity pay, which were actually paid to [plaintiff], should have been used to calculate [plaintiff's] overtime rate"). Plaintiffs also argue that the disputed administrative fee and captain's share of the tips, which were discussed at length above, should have also been included in plaintiffs' overtime calculation. As explained earlier, plaintiffs' underlying claims concerning these monies is not preempted. Accordingly, their claim that such payments should have also been factored into their overtime calculations is not preempted by § 301.

### v. The Claim that the Hotel and its Managers Improperly Kept Certain Tips

Finally, plaintiffs allege that defendants failed to pay to plaintiffs all voluntary gratuities left by customers and that managers improperly retained a portion of the tip pool. (See Pls. Mem. at 8–9.). Defendants dispute this claim, arguing, inter alia, that this claim is not even properly before the Court because it was not alleged in plaintiffs' complaint. (See NWPH Reply Mem. at 5 n.1; Amedeo Reply Mem. at 4.) The Court assumes, solely for purposes of the preemption analysis, that this claim is properly before the Court.

16

Plaintiffs argue that because defendants withheld these disputed tips, plaintiffs "received less than their entitlement under the NYLL and CBA." (Pls. Mem. at 8 (emphasis added).) To the extent that this claim seeks recovery of tips based on the theory that plaintiffs were entitled to the tips under the CBAs, this claim is preempted. To the extent that this claim simply seeks recovery of tips based solely on the theory that defendants' retention of the tips violated independent rights under the NYLL, this claim is not preempted. The details of this claim are insufficiently developed for the Court to address the issue of § 301 preemption with any additional precision for this claim.

*vi. Amedeo's Remaining Arguments*

The Court now turns to the remaining arguments that Amedeo advances under the rubric of § 301 preemption.

Amedeo suggests, without citation to any authority, that plaintiffs' NYLL claims were "resolved" through negotiations that resulted in the May 2011 Agreement. (Amedeo Reply Mem. at 2.) Amedeo, however, never actually argues that this agreement released or waived any past or future claims under the NYLL. And, even if plaintiffs' NYLL claims could be waived or released in a CBA, such a waiver or release would have to be "'clear and unmistakable.'" Wadsworth v. KSL Grand Wailea Resort, Inc., 818 F. Supp. 2d 1240, 1251 (D. Haw. 2010) (quoting Valles v. Ivy Hill Corp., 410 F.3d 1071, 1076 (9th Cir. 2005)); see also Hinterberger v. Catholic Health, No. 08-CV-380S, 2008 WL 5114258, at *6 n.5 (W.D.N.Y. Nov. 25, 2008) (suggesting that even if certain provisions of the NYLL might be waivable, a CBA would have contain "a clear and unmistakable waiver" to waive a NYLL claim), amended on reconsideration by, 2009 WL 4042718, at *2 (W.D.N.Y. Nov. 19, 2009).

17

The May 2011 Agreement contains no such language—it merely states that the Union's grievance is dismissed with prejudice. (May 2011 Agreement at 3.) Moreover, the Court notes that the bargaining that culminated in the May 2011 Agreement began with the May 2010 letter that the servers sent to the Union. The May 2010 letter complained that the Hotel's actions regarding the hospitality service charges violated the CBA, but said nothing about violations of the NYLL. This further confirms that the May 2011 Agreement did not resolve plaintiffs' NYLL claims.

Amedeo also notes that the IWA contains a broad arbitration provision. However, Amedeo never actually argues that this arbitration provision covers claims under the NYLL. In any event, it is clear that this provision, which does not explicitly refer to NYLL claims, does not compel arbitration of such claims. "A collective bargaining agreement cannot preclude a lawsuit concerning individual statutory rights unless the arbitration clause in the agreement was 'clear and unmistakable' that the parties intended to arbitrate such individual claims." Alderman, 733 F. Supp. 2d at 469 (quoting Wright v. Universal Mar. Serv. Corp., 525 U.S. 70, 79–80 (1998)); see also 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 256 (2009). The arbitration provision in the IWA does not meet this standard.

Finally, none of the remaining arguments that Amedeo asserts under the guise of preemption justify preemption here. Accordingly, § 301 does not preempt plaintiffs' NYLL claims.

### E. **Supplemental Jurisdiction**

Because plaintiffs' FLSA claim has been dismissed and plaintiffs' remaining state law claims are not preempted, the Court again turns to the question of supplemental jurisdiction.

District courts "may decline to exercise supplemental jurisdiction over a [state law] claim . . . if . . . the claim raises a novel or complex issue of State law [or] . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon U. v. Cohill, 484 U.S. 343, 350 n.7 (1988).

Since all of the federal claims have been dismissed on summary judgment, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims and will remand those claims back to state court. The Court's decision to remand these claims to state court is buttressed by the Court's conclusion that plaintiffs' claims for recovery of the administrative fees retained by the Hotel appear to raise novel questions of state law.

Plaintiffs claim that defendants' retention of the administrative fee for hospitality events violated NYLL § 196-d because the documentation provided to customers for these events either failed to disclose that the Hotel would retain a portion of the service charge as an administrative fee or included inadequate notice to the customers about the administrative fee. NYLL § 196-d states, in relevant part, that "[n]o employer . . . shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee." Id. (emphasis added). In Samiento v. World Yacht Inc., 883 N.E.2d 990, 994–95 (N.Y. 2008), the seminal case in this area, the New York Court of Appeals held that, in considering claims such as plaintiffs', the standard is whether a "reasonable patron . . . would understand" that the mandatory charge collected by the employer was a gratuity. In January 2011, the New York State Department of Labor ("NY DOL") issued

19

regulations further clarifying the contours of such claims. N.Y. Comp. Codes R. Regs. tit. 12, §§

146–2.18, 2.19.   Section 146-2.19 of the regulations, entitled "Administrative charge not

purported to be a gratuity or tip," states:

> (a) A charge for the administration of a banquet, special function, or package deal
> shall be clearly identified as such and customers shall be notified that the charge
> is not a gratuity or tip.
>
> (b) The employer has the burden of demonstrating, by clear and convincing
> evidence, that the notification was sufficient to ensure that a reasonable customer
> would understand that such charge was not purported to be a gratuity.
>
> (c) Adequate notification shall include a statement in the contract or agreement
> with the customer, and on any menu and bill listing prices, that the administrative
> charge is for administration of the banquet, special function, or package deal, is
> not purported to be a gratuity, and will not be distributed as gratuities to the
> employees who provided service to the guests. The statements shall use ordinary
> language readily understood and shall appear in a font size similar to surrounding
> text, but no smaller than a 12-point font.

Id. (emphasis added).

At least some of the Hotel's hospitality contracts contained notices about the

administrative fee that appear to comply with the regulations in every respect except for the fact

that the notices are in less than 12-point font.[6]  Plaintiffs suggest that failure to abide by the

regulation's 12-point font requirement is a per se violation of § 196-d that automatically renders

the administrative fees at issue "purported" gratuities under the statute.  NWPH argues that the

regulations are ambiguous and that § 2.19(c) of the regulations is merely a safe-harbor provision.

NWPH also contends that plaintiffs' interpretation of the regulations would lead to an illogical

result.   No state or federal courts have resolved this question of interpretation, although one

---

[6] In discussing this claim, the Court does not purport to resolve the merits of these issues, which are discussed only
to highlight their novelty.

federal court has characterized NWPH's position as, at least, "colorable."[7] Maldonado v. BTB

Events & Celebrations, Inc., 990 F. Supp. 2d 382, 393–94 (S.D.N.Y. 2013). Moreover, even if

plaintiffs' interpretation of this regulation is correct, the question then arises whether, given the

deference accorded to the NY DOL's interpretations of the NYLL, this regulation is a

permissible interpretation of NYLL § 196-d.[8] See Samiento, 883 N.E.2d at 994–95 ("The Labor

Department's interpretation of a statute it is charged with enforcing is entitled to deference. The

construction given statutes and regulations by the agency responsible for their administration, 'if

not irrational or unreasonable,' should be upheld." (citations omitted)); see also Barenboim v.

Starbucks Corp., 995 N.E.2d 153, 158 (N.Y. 2013). These novel questions of New York law

should be decided by New York State courts and provide an additional reason for this Court to

decline supplemental jurisdiction over the NYLL claims.

### III. CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are granted on

plaintiffs' FLSA claim. With the one minor exception noted on page 17 supra, the Court rejects

Amedeo's argument that plaintiffs' NYLL claims are preempted by § 301 of the LMRA. The

Court declines to exercise supplemental jurisdiction over plaintiffs' NYLL claims and remands

---

[7] During the notice-and-comment process for this regulation, some commentators indicated that "[r]equiring" this notification in 12-point font on all marketing documents would be burdensome and, instead, suggested that having this notification in the same font as the surrounding text should be sufficient. N.Y. Reg. Dec. 29, 2010, LAB-21-10-00005-A. The NY DOL concluded that this concern was unfounded and responded that "[w]e . . . are keeping that 12-point font requirement." Id. None of the parties here mention the NY DOL's response to this comment.

[8] The Court also notes that some of the Hotel's customers for hospitality events appear to have been large corporate clients who are presumably well-versed in reviewing contracts. (See, e.g., Wims Decl. Ex. 1 (contracts for hospitality events held by Morgan Stanley, Wells Fargo, Hyundai Motor, and Honeywell).)

.

those claims back to New York State Supreme Court, Kings County.  The Clerk of Court is

directed to close this case.

Dated: March 29, 2016
Central Islip, New York

                /s/ (JMA)
                JOAN M. AZRACK
                UNITED STATES DISTRICT JUDGE

Case 1:12-cv-04418-JMA  Document 87  Filed 03/30/16  Page 1 of 1 PageID #: 1879

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
RUBEN DIAZ, RENE FERNANDEZ,
MOHAMMED ISMAT, PRADIP SAHA,
RAMANDRA SAHA, MAXINE SMITH,
ABDUR RAQUIB, JOHNNY RAMIREZ,
MADGY SAAD, WALTER FREIRE,
MOZIBUR RAHMAN, CHRISTOPHER
STAVROPOULOS, ABDUR RAHMAN,
SYED AHMED, WALTER GARCIA,
ASHIF MIRU, BISWA SAHA, SAYOT
ALPHONSE, ALBERTO PRADO, MAURICE
SCHWARTE, ABELLA BOUALE, DENZIL
HANNAH, MILAD BARSOUM, MOAZZEMUL
HAQUE, and ARUN SAHA,

Plaintiffs,

- against -

AMEDEO HOTELS LIMITED PARTNERSHIP,
NWPH, LLC, and NORTHWOOD
HOSPITALITY, LLC.,

Defendants.
----------------------------------------------------------------X

**FILED
CLERK**

3/30/2016 4:11 pm

**U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE**

**JUDGMENT**
CV 12-4418 (JMA)

An Order of Honorable Joan M. Azrack, United States District Judge, having been filed

on March 29, 2016, granting defendants' motion for summary judgment on plaintiffs' Fair Labor

Standards Act claim; declining to exercise supplemental jurisdiction over plaintiffs' New York

Labor Law claims; remanding plaintiffs' New York Labor Law claims back to New York State

Supreme Court, Kings County; and directing the Clerk of Court to close this case, it is

**ORDERED AND ADJUDGED** that defendants' motion for summary judgment on

plaintiffs' Fair Labor Standards Act claim is granted; that the Court declines to exercise

supplemental jurisdiction over plaintiffs' New York Labor Law claims; that plaintiffs' New York

Labor Law claims are remanded back to New York State Supreme Court, Kings County; and that

this case is hereby closed.

Dated: Central Islip, New York
       March 30, 2016

                                        DOUGLAS C. PALMER
                                        CLERK OF THE COURT

                              BY:    /S/ JAMES J. TORITTO
                                     DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
Brooklyn Division**

| | |
|---|---|
| RUBEN DIAZ, RENE FERNANDEZ, MOHAMMED ISMAT, PRADIP SAHA, RAMANDRA SAHA, MAXINE SMITH, ABDUR RAQUIB, JOHNNY RAMIREZ, MADGY SAAD, WALTER FREIRE, MOZIBUR RAHMAN, CHRISTOPHER STAVROPOULOS, ABDUR RAHMAN, SYED AHMED, WALTER GARCIA, ASHIF MIRU, BISWA SAHA, ALPHONSE SAYOT, ALBERTO PRADO, MAURICE SCHWARTE, ABELLA BOUALE, DENZIL HANNAH, MILAD BARSOUM, MOAZZEMUL HAQUE, and ARUN SAHA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| AMEDEO HOTELS LIMITED PARTNERSHIP, NWPH, LLC, NORTHWOOD HOSPITALITY, LLC | ) ) ) ) |
| Defendants. | ) ) ) |

Case No. 1:12-cv-04418-DLI-JMA

**NOTICE OF APPEAL**

Notice is hereby given that Amedeo Hotels Limited Partnership, a defendant in the above

named case, hereby appeals to the United States Court of Appeals for the Second Circuit from

the Order entered on March 29, 2016 and Judgment entered on March 30, 2016.

This 27th day of April, 2016.

Case 1:12-cv-04418-JMA   Document 91   Filed 04/27/16   Page 2 of 4 PageID #: 1902

**STOKES WAGNER, ALC**

/s/ John R. Hunt

_____

Paul E. Wagner, Esq.
New York Bar No. (PW-0177)
John R. Hunt, Esq.
Georgia Bar No. 378530
One Atlantic Center, Suite 2400
1201 W. Peachtree Street
Atlanta, Georgia 30309
(404) 766-0076 (Telephone)
(404) 766-8823 (Facsimile)
jhunt@stokeswagner.com

Attorneys for Defendant Amedeo
Hotels Limited Partnership

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK
### Brooklyn Division

| | |
|---|---|
| RUBEN DIAZ, RENE FERNANDEZ, MOHAMMED ISMAT, PRADIP SAHA, RAMANDRA SAHA, MAXINE SMITH, ABDUR RAQUIB, JOHNNY RAMIREZ, MADGY SAAD, WALTER FREIRE, MOZIBUR RAHMAN, CHRISTOPHER STAVROPOULOS, ABDUR RAHMAN, SYED AHMED, WALTER GARCIA, ASHIF MIRU, BISWA SAHA, ALPHONSE SAYOT, ALBERTO PRADO, MAURICE SCHWARTE, ABELLA BOUALE, DENZIL HANNAH, MILAD BARSOUM, MOAZZEMUL HAQUE, and ARUN SAHA, | Case No. 1:12-cv-04418-DLI-JMA |
| Plaintiffs, | |
| v. | |
| AMEDEO HOTELS LIMITED PARTNERSHIP, NWPH, LLC, NORTHWOOD HOSPITALITY, LLC | |
| Defendants. | |

### CERTIFICATE OF SERVICE

I hereby certify that I have this day sent the foregoing document to counsel of record

listed below via the Court's CM/ECF website:

David Wims, Esq.
Law Offices of David Wims
Attorney for Plaintiffs
1430 Pitkin Avenue, 2nd Floor
Brooklin, New York 11233

Judith Stoll, Esq.
Alexander Soric, Esq.
Kane Kessler, P.C.
1350 Avenue of the Americas
New York, New York 10019

3

Case 1:12-cv-04418-JMA   Document 91   Filed 04/27/16   Page 4 of 4 PageID #: 1904

Dated: April 27, 2016.

Stokes Wagner, ALC

/s/ John R. Hunt

John R. Hunt

4